UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

MEDINOL LTD.,

               **Plaintiff,**

   - against -

CORDIS CORPORATION AND JOHNSON
& JOHNSON,

               **Defendants.**
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/14/14

**OPINION AND ORDER**

**13 Civ. 1408 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

Medinol Ltd. ("Medinol") brings this patent infringement action against Cordis Corporation and Johnson & Johnson (collectively, "Cordis"). On June 13, 2013, I granted defendants' request to bifurcate the case in order to address Cordis's equitable defense of laches prior to starting discovery on the merits. I held a bench trial on the issue of laches from January 20 to January 24, 2014. The parties made post-trial submissions on January 31, 2014. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law.[1]  In reaching these findings and conclusions, I

---

[1]    The following findings of fact and conclusions of law are limited to those issues that are pertinent to laches. Nevertheless, the parties introduced

the testimony, examined the documentary evidence, observed the demeanor of the

witnesses, and considered the arguments and submissions of counsel.

## II.   FINDINGS OF FACT

### A.   The Parties

Medinol is an Israeli medical devices company founded by Drs. Jacob

(Kobi) Richter and Judith Richter in the early 1990s.[2]  Dr. Kobi Richter ("Richter")

also serves as Medinol's chairman and chief technology officer.[3]  Cordis is a

medical device company incorporated in Florida and an affiliate of Johnson &

Johnson, a public corporation based in New Jersey.[4]

### B.   The Patents and Products at Issue

#### 1.   Medinol's Patents

---

extensive testimony and evidence about the mechanics of coronary stents and the
underlying patents.  Likelihood of success on the merits is not an element of
laches.  To the extent any finding or conclusion contained in this opinion is a
description of the patents or products at issue, or a finding as to various witnesses's
opinions or conclusions about the patents or products at issue, none of these
findings or conclusions pertain to claim construction or to the validity of the
underlying patents.

[2]      *See* Plaintiff's Proposed Findings of Fact ("Pl. Facts") ¶ 1;
Defendants' Proposed Findings of Fact ("Def. Facts") ¶ 1; Transcript ("Tr.") at 65
(Richter).

[3]      *See* Joint Stipulated Facts ("Stip. Facts"), Exhibit ("Ex.") A to the
Joint Pretrial Order ("JPTO"), ¶ 5; Tr. at 65 (Richter).

[4]      *See* Def. Facts ¶¶ 2-3; Pl. Facts ¶ 2.

This case pertains to the following patents, which were invented by Gregory Pinchasik and Jacob Richter and are owned by Medinol:

- U.S. Patent No. 5,980,552 (the "'552 patent"), issued on November 9, 1999;
- U.S. Patent No. 6,059,811 (the "'811 patent"), issued on May 9, 2000;
- U.S. Patent No. 6,589,276 (the "'276 patent"), issued on July 8, 2003; and
- U.S. Patent No. 6,875,228 (the "'228 patent"), issued on April 5, 2005 (collectively, the "Pinchasik patents").[5]

Each of the Pinchasik patents "issued from a continuation patent application, and each of these continuation patents claims priority to the ultimate parent application [–] U.S. Patent No. 5,449,373 (the "'373 patent"), issued on September 12, 1995."[6]

Each of the Pinchasik "patents has the same figures" and each of the Pinchasik patents includes "claims . . .read[ing] on the embodiments of Figure 3 as described in the accompanying text of the specifications."[7] While the claims in the Pinchasik patents vary,[8] much of the key text, including the "Field and Background

---

[5] *See* Defendants' Exhibit ("DX") A-D (the Pinchasik patents); Stip. Facts ¶¶ 1-4, 6.

[6] Stip. Facts ¶ 7; DX E ('373 patent).

[7] Stip. Facts ¶¶ 7-9.

[8] *See* Tr. at 84 (Richter) ("They have different claims. While all of them cover Figure 3, several of them cover more things than just that one embodiment.").

of the Invention," "Summary of the Invention," "Brief Description of the Drawings" and "Description of the Preferred Embodiments" sections are substantially similar.[9]  The Pinchasik patents describe "articulated stents" that have "substantially rigid segments" connected by "flexible links" that allow the stent to bend.[10]  Neither Richter nor Medinol ever sought to sell or licence the Pinchasik patents to a third party.[11]

Medinol also owns a second suite of stent patents, which are "continuations in part" from the '373 patent.[12]  This suite of patents – U.S. Patent No. 5,733,303, issued on March 31, 1998 (the "'303 patent"); U.S. Patent No. 5,843,120, issued on December 1, 1998; and U.S. Patent No. 5, 972,018 (the "'018 patent") (collectively, the "Israel patents") – was invented by Henry Marshall Israel and Gregory Pinchasik.[13]  Richter admits that the Israel patents are continuations in part of the original '373 Pinchasik patent.[14]  The Israel patents are similar to the Pinchasik patents except that the latter suite is "uniformly flexible"

---

[9]     Stip. Facts ¶ 7.

[10]     *Id.* ¶ 11.

[11]     *See* Tr. at 90-91 (Richter).

[12]     *Id.* at 85 (Richter).  *Accord* DX F ('303 patent).

[13]     *See* Tr. at 84-85; Stip. Facts ¶¶ 66-68.

[14]     *See* Tr. at 85 (Richter).

along its length.[15]  Medinol licensed the Israel patents to Boston Scientific
Corporation ("Boston Scientific") in 1996.[16] But Richter believes that the Israel
patents were different because they created a "uniformly flexible" stent, while the
Pinchasik patents created an "articulated" stent."[17]

Richter considered the Israel patents to be stronger than the Pinchasik
patents.  This is reasonably inferred from the fact that Richter has never sought to
sell, license or enforce the Pinchasik patents but did license the Israel patents to a
major medical devices company.  Further, as discussed below, Medinol
aggressively enforced the Israel patents around the world but never brought a claim
on the Pinchasik patents until filing this suit.

### 2.    Cordis's Products

Medinol alleges that Cordis's Cypher and Cypher Select stents
infringe the Pinchasik patents.  The Cypher stent was introduced in Europe in 2002
and in the United States in 2003.[18]  The Cypher Select was introduced in Europe in

---

[15]    *Id.* at 84 (Richter).

[16]    *See id.* at 93 (Richter).

[17]    *Id*. at 84-85 (Richter).

[18]    *See* DX ZG (designated deposition testimony of Robert Croce, former
Company Group Chairman of Johnson & Johnson Interventional Systems/Cordis,
taken on 1/14/14), at 20.

2003 but has never been sold in the United States.[19]

The Cypher and Cypher Select are drug-eluting stents that cover a platform bare-metal stent with a polymer sirolimus coating to release the drug inside the artery.[20]  The platform bare-metal stent used in the Cypher is the BX Velocity[21] and the platform bare-metal stent in the Cypher Select is the BX Agile.[22] The platform bare-metal stents for both the Cypher and the Cypher Select "were at all times manufactured by Norman Noble in Ohio."[23]

Cordis previously sold the BX Velocity as a bare-metal stent in Europe starting in 1999 and in the United States starting in 2000, but never sold the BX Agile bare-metal stent.[24]  Medinol posits that although the two drug-eluting stents use different bare-metal platforms, there is "hardly a difference between the Cypher Select and the Cypher."[25]  On June 15, 2011, Cordis announced that it

---

[19]    See Stip. Facts ¶¶ 17, 22.

[20]    See id. ¶ 20.

[21]    See DX ZG at 27; Tr. at 379 (Dr. Robert Falotico, pharmaceutical researcher at Cordis).

[22]    See Stip. Facts ¶ 22; DX ZG at 38-39.

[23]    Stip. Facts ¶ 23.

[24]    See DX ZG at 9.

[25]    Tr. at 129 (Richter).

would "stop the manufacture of Cypher and Cypher Select . . . by the end of 2011."[26]

### C.    The Medinol-Cordis Relationship

#### 1.    April 2000 – October 2004: The *Israel* Litigation

On April 14, 2000, Boston Scientific and Medinol sued Cordis for patent infringement in the United States District Court for the District of Delaware, seeking damages, a preliminary injunction and a permanent injunction based on allegations that the BX Velocity infringed the Israel patents.[27]   The Pinchasik patents were not asserted during the *Israel* litigation.[28]   After Boston Scientific filed the infringement lawsuit against the BX Velocity, Cordis began a "standard procedure" of exploring design options to develop a non-infringing alternative to the BX Velocity.[29]   The product of this development was the BX Agile bare-metal stent used as the platform for the Cypher Select.[30]

---

[26]      Stip. Facts ¶ 18.

[27]      *See id.* ¶ 65.  The Delaware case was consolidated with Boston Scientific and Medinol's 1999 lawsuit in the United States District Court for the District of Minnesota for infringement of the Israel patents in connection with several other Cordis stents.  *See id.*

[28]      *See id.* ¶ 69.

[29]      DX ZG at 17.

[30]      *See id*. at 38.

In the summer of 2000, Cordis argued against a preliminary injunction on the grounds that the BX Velocity was not "substantially uniformly flexible along its longitudinal axis" and thus did not infringe the Israel patents.[31]  Richter was present in the courtroom for the August 3, 2000 oral arguments on the preliminary injunction motion and throughout the duration of the trial in 2001.[32]  Cordis advanced the same argument during the trial, arguing that the "BX Velocity did not meet the 'substantially uniformly flexible' limitation of claim 47 of the '018 patent [because] most of the flexibility of the BX Velocity is in the connectors."[33]  Cordis also argued that claim 12 of the '303 patent, which reads on Figure 3 of the '373 patent, is invalid for obviousness because it is a combination

---

[31]    Stip. Facts ¶¶ 70-71.

[32]    *See id.* ¶ 72.

[33]    *Id.* ¶ 75.  Cordis clarifies that "[t]he question of uniform flexibility . . . was a defense to only one claim of one patent" and that "[t]he heart of Cordis's non-infringement defense was that all of the Israel patents required that the flexible connector be a 'flexible link,' which the district court construed to require that the connector 'be aligned along the longitudinal axis of the stent.'"  Def. Facts. ¶¶ 25-26.  Medinol asserts that Cordis's evidence and testimony in support of this theory was contrary to earlier statements Cordis's expert made about the BX Velocity in support of related patent applications.  *See* Pl. Facts ¶¶ 11-12 and n.1-2.  I do not need to resolve this dispute because it is, in essence, an argument about the merits of Cordis's non-infringement defense in the *Israel* case, which has already been decided, and in the instant action, which has not yet reached the merits phase.

of prior art from earlier patents.[34]

The trial court "denied Medinol's request for a preliminary injunction."[35]  On September 12, 2011, the jury in the *Israel* trial returned a verdict in favor of Cordis on both obviousness and non-infringement.  On September 22, 2002, the court "denied Medinol's motions for judgment as a matter of law and for a new trial."[36]  On January 14, 2004, the United States Court of Appeals for the Federal Circuit affirmed the finding of invalidity but chose not to reach the finding

---

[34]     *See* Tr. at 482-484 (designated testimony of Dr. Nigel Buller taken in the *Israel* case on 9/4/01).  The trial and post-trial submissions reveal that Cordis intends to use the same non-infringement and invalidity defenses against the Pinchasik patents.  *See, e.g.*, Def. Facts ¶ 27 ("The asserted Pinchasik patents all require the same horizontal 'flexible link' and the Cypher and Cypher Select stents do not infringe those patents for the same reason they do not infringe the Israel patents: their connectors are not aligned along the longitudinal axis of the stent.") and ¶ 30 ("All of the asserted Pinchasik patent claims are simply verbal descriptions of Figure 3, and none is patentably distinct from invalid Claim 12 of the Israel '303 patent, making all of the asserted Pinchasik claims invalid.").  These arguments are not relevant to the laches opinion and I did not consider them in reaching these findings and conclusions, except to acknowledge that Figure 3 of the '373 patent appears in each of the subsequent Pinchasik continuation patents and that the jury in the Israel case concluded that Figure 3 was obvious.

[35]     Stip. Facts ¶ 73.

[36]     *Id.* ¶ 87.  The District Court granted Medinol's JMOL "with respect to the [jury's finding of] invalidity based on failure to satisfy the written description requirement of 35 U.S.C. 112 ¶ 1."  *Id.  Accord Scimed Life Sys. v. Johnson & Johnson*, 225 F. Supp. 2d 422, 438-39 (D. Del. 2002).  This ruling did not impact the jury's findings on invalidity based on obviousness or non-infringement.

of non-infringement.[37]  On October 4, 2004, the United States Supreme Court denied Medinol's petition for a writ of certiorari.[38]

Richter testified that he did not realize that the BX Velocity potentially infringed the Pinchasik patents until 2005, after the *Israel* litigation finished.[39]  This testimony is not credible.  While Richter may have legitimately believed that the BX Velocity was "continuously" or "uniformly" flexible, he was clearly on notice that Cordis did *not* believe the BX Velocity was continuously flexible and instead argued that it achieved flexibility from articulation points or hinges.  This was obvious from Cordis's advertising of the BX Velocity[40] and from the arguments it advanced during the August 2000 preliminary injunction hearing and the September 2001 trial.  Richter "never put [the Pinchasik] patents in the case because [he] thought the BX Velocity infringe[d] the Israel patents for a

---

[37]   *See Scimed Life Sys. v. Johnson & Johnson*, 87 Fed. App'x 729 (Fed. Cir. 2004).  Medinol's petition for rehearing and rehearing en banc was denied on February 23, 2004.

[38]   *See Medinol Ltd. v. Johnson & Johnson*, 543 U.S. 814 (2004).

[39]   *See, e.g.*, Tr. at 112-113, 129-130 (Richter).

[40]   *See* Plaintiff's Exhibit ("PX") 372 (advertisement for BX Velocity stating that "continuous flexibility [is] achieved by placing flex segments every millimeter along stent" and that "FlexSegments are designed to act as hinge points on the stent.").  Richter acknowledges that articulation points and hinges "are the same thing." Tr. at 116.

flexible stent."[41]

### 2.   October 2004 - February 2011: Litigation, Negotiation and Business Relationship

After the conclusion of the Delaware litigation, Medinol continued to sue Cordis for patent infringement – including infringement of the Israel patents – around the world.[42]   Medinol also sued other manufacturers for infringement of the Israel patents within the United States.[43]   Richter testified that some time in 2005 or 2006, he retained Christopher Hughes, a patent attorney at Morgan & Finnegan, to explore a potential patent infringement suit against Cordis for violation of the Pinchasik patents.[44]   But until Medinol filed the current action on March 4, 2013, it had never sued Cordis or any other party anywhere in the world based on alleged infringement of the Pinchasik patents.[45]

Medinol's distribution relationship with Boston Scientific and W.L.

---

[41]   Tr. at 104 (Richter).

[42]   *See* Stip. Facts ¶ 96; Tr. at 545-546 (Rory Millson, counsel for Medinol).

[43]   *See* Tr. at 127 (Richter) (describing suit against Guidant and arbitration proceeding against Boston Scientific).

[44]   *See id*. at 223-224 (Richter).   Medinol did not waive attorney-client privilege or work-product protection in connection with any opinion that Hughes produced pertaining to a potential Pinchasik claim.

[45]   *See* Stip. Facts ¶ 95; Tr. at 103-104, 145 (Richter).

Gore ended by 2005 and Medinol was exploring the possibility of finding a new business partner.[46]  At or around the same time, Cordis was looking for opportunities to bolster its stent business, which had begun to see a "precipitous drop in sales."[47]  After a proposed merger between Cordis and Guidant fell apart, executives at Cordis had internal discussions about exploring a partnership with Medinol and reaching out to Richter.[48]  On March 15, 2006, Richter met with Rick Anderson and Nicholas Valeriani, two high-level Cordis executives to explore a potential relationship.[49]  In June 2006, after Anderson visited Medinol's manufacturing facilities in Israel, Medinol proposed a "potential cooperation plan" which included a distribution agreement for Cordis to market and sell Medinol's products, a manufacturing agreement for Medinol to create and supply the bare-metal components of Cordis's products, a joint research and development

---

[46]     *See* Tr. at 187-188 (Richter).

[47]     *Id.* at 415 (Rick Anderson, former president of Cordis Cardiology and worldwide company group chairman for Cordis).

[48]     *See id.* at 416-418 (Anderson); PX 5B (2/21/06 email chain between Nicholas Valeriani, former worldwide company group chairman for Cordis, Rick Anderson, Susan Morano, former vice-president for health economics at Cordis, and Philip Johnson, in-house counsel at Cordis).

[49]     *See id.* at 191-193 (Richter); *id.* at 440-441 (Anderson); PX 383 (3/6/06 email from Paula Feath, assistant to Valeriani, to Richter, confirming the 3/15/06 meeting).

agreement, and a proposal for Cordis to eventually acquire an equity stake in Medinol.[50]

A few weeks later, the parties signed an agreement to stay all pending litigation and toll

> the running of any applicable statute of limitations on any claim or cause of action which the Parties have or may have against one another, whether known or unknown, that are based upon any law, statute, rule, or regulation, or any rule or regulation of any governing body or organization, including but not limited to any patent infringement action that could be filed under the laws of the United States [from June 19, 2006 until July 6, 2007.][51]

Both sides agree that the purpose of the 2006 tolling agreement was to give the parties an opportunity to work out a deal.[52]  Medinol did not tell Cordis that it was considering a patent infringement suit based on the Pinchasik patents.[53]

Approximately one year later, Medinol and Cordis signed a distribution agreement.[54]  The final agreement was significantly narrower in scope

---

[50]    *See* PX 6 (6/2/06 letter from Richter to Anderson).

[51]    DX R (2006 tolling agreement), ¶ 2.

[52]    *See* Tr. at 136 (Richter) ("[The tolling agreements] were brought about in order to enable the parties to conduct negotiation for a possible cooperation."); *id*. at 429 (Anderson) ("[I]t basically stayed all of our pending litigation to give us time to sort of work on . . . the kind of business relationship that both sides could work with.").

[53]    *See id.* at 136-140 (Richter).

[54]    *See* DX T (4/18/07 distribution agreement).

13

than Medinol's proposed plan.  Cordis obtained exclusive rights to distribute

Medinol's cobalt-chromium bare-metal stents for five years, but the exclusivity

was not reciprocal.[55]  The agreement allowed Cordis to decide whether to buy

stents from Medinol and in what quantity, and to sell other, competing stents.[56] Per

the agreement, Medinol received a high royalty rate of 50-60% for sales of its

stents.[57]  The parties signed various extensions to the distribution agreement which

made it effective through 2014.[58]

In connection with the distribution agreement, Medinol and Cordis

signed a settlement agreement ending all existing patent litigation and patent office

proceedings between the two parties without an exchange of money.[59]  Medinol

also granted Cordis a covenant not to sue for infringement of foreign Medinol

patents,[60] and Cordis agreed to indemnify Medinol in connection with the ongoing

dispute between Medinol and Boston Scientific.[61]  Finally, the settlement

---

[55]     *See id.* §§ 2.01 and 12.01.

[56]     *See id.* §§ 2.02, 4.01, and 4.04.

[57]     *See id.* at Schedule D.

[58]     *See* Stip. Facts ¶ 61.

[59]     *See* DX R (2007 settlement agreement), §§ 2.2, 2.3, 2.4, and 2.7.

[60]     *See id.* § 2.1.

[61]     *See id.* § 2.5.

14

agreement included a provision that would toll "the running of any applicable statute of limitations on any U.S. Claims that Medinol and [Cordis] . . . have or may have against one another, whether known or unknown" from June 19, 2006 to July 7, 2008.[62]

> During negotiations over the settlement agreement, Cordis suggested eliminating the tolling provision, but Rory Millson, counsel for Medinol, insisted that the provision be included "to allow the parties to address cooperation more broadly without having to pay attention to U.S. litigation issues."[63] Richter testified that the reason he insisted on the tolling provision in 2007 was because he wanted to see how the business relationship would progress.[64]

> After the 2007 agreements, Medinol continued to propose new manufacturing deals and expansions of the relationship with Cordis.[65] Richter also

---

[62] *Id.* § 2.8.

[63] DX ZQ (5/7/07 letter from Millson to Paul Coletti, counsel for Cordis).

[64] *See* Tr. at 150-152 (Richter).

[65] *See id.* at 196-199 (Richter).  DX KF (6/29/10 letter from Richard Dakers, Cordis's vice-president of franchise development to Richter) ("[I]n response to your email dated May 31, 2010 . . . [Cordis] ha[s] decided that we will not exercise our option to engage Medinol in discussions 'on terms to purchase, license or otherwise have access" to new products).

approached Cordis to see if it was interested in an acquisition of Medinol.[66]

Throughout this time period, Medinol never brought or disclosed a Pinchasik suit,

even after the tolling period expired.  Richter testified that he "had to weigh two

options: one, to bring the lawsuit and most probably to terminate the relation at that

point, or two, to nurture the cooperation, which [he] . . . believed was a 2 to 3.5

billion dollar opportunity."[67]  Richter concluded that he "preferred the chance of

winning billions for making stents [to] the chance of winning even more billions

from lawsuits."[68]

        Cordis reasonably believed that the 2007 settlement agreement

resolved the outstanding claims.  Anderson testified that one of his key goals in

exploring a Medinol partnership was to "resolve our legal issues as sort of a first

step" before becoming "business partners going forward."[69]  To the extent Millson

clarified that Medinol retained potential U.S. claims and needed an additional year

of tolling to determine whether to pursue them, Cordis was justified in thinking

that any such claims were abandoned when Medinol brought no lawsuit after the

---

[66]    *See* DX KI (1/11 confidential offering memorandum, prepared by the Blackstone Group); *see also* Tr. at 162-163 (Richter).

[67]    Tr. at 201 (Richter).

[68]    *Id.*

[69]    *Id.* at 429 (Anderson).

expiration of the tolling agreement.

### 3.    End of Business Relationship

Beginning in 2007, Cordis's stent business dramatically declined as a result of competing stents, a reduced market demand and the high cost of stent manufacturing.[70]  In February 2011, Cordis notified Medinol that "changing market dynamics and business circumstances require" Cordis to stop distributing Medinol's stents.[71]  Cordis told Medinol that it would be "willing to terminate our exclusive contract to allow Medinol to obtain another commercial partner, prior to the official contract expiration of December 31, 2014."[72]  Medinol attempted to find another partner to replace Cordis.  On June 15, 2011, Cordis issued a press release announcing its complete exit from the coronary stent market.[73]

On August 11, 2011, Richter notified Cordis that he considered Cordis's early termination to be a breach of the distribution agreement and

---

[70]    *See id*. at 415-418, 423-424 (Anderson), 487-491 (Seth Fischer, former worldwide company group chairman of Cordis); DX HM (06/14/11 presentation to Johnson & Johnson's board of directors explaining basis for Cordis's exit from the stent market).

[71]    DX EV (2/17/11 email from Raymond Suehnholz, vice-president of global strategic marketing at Cordis, to Drs. Kobi and Judith Richter).

[72]    *Id*.

[73]    *See* Stip. Facts ¶ 18.

demanded $17.1 million in damages.[74]  Cordis believed that it was within its rights

under the distribution agreement to stop selling Medinol's stents.  On August 30,

2012, the parties signed a final termination agreement under the terms of which

Cordis paid no compensation and released Medinol from the exclusivity

agreement.[75]  Richter did not mention the Pinchasik claims during this time period

because he "was concerned" about filing that lawsuit while "still locked in this

agreement."[76]

Shortly after the termination agreement, new management at Cordis

approached Medinol to discuss reviving a business relationship.[77] Richter proposed

a confidentiality agreement with a tolling provision that would retroactively toll all

U.S. claims from June 19, 2006 to July 7, 2013.[78] Uri Yaron, Cordis's vice-

president of business development, replied that the tolling agreement is

unnecessary because

---

[74]    *See* DX V (8/11/11 letter from Drs. Kobi and Judith Richter to
Suehnholz).

[75]    *See* DX U (2012 termination agreement).

[76]    Tr. at 167 (Richter).

[77]    *See id*. at 234 (Richter).

[78]    *See* DX EY (12/5/12 email from Richter to Shlomi Nachman,
worldwide company group chairman of Cordis and Uri Yaron, vice-president of
business development, attaching draft confidentiality agreement).

> [w]hatever rights either of us have formerly possessed have . . .
> all been settled.  So, it would seem to us that there is no
> possible right (for either party) to toll.  If you can explain to us
> how our understanding is incorrect, we are willing to entertain a
> 'tolling clause,' but in any event, the period should only start
> now (in deference to our negotiations) and not in 2006.  From
> our perspective, it seems best to just eliminate paragraph 13.[79]

Richter responded that Medinol "still ha[s] unsettled issues in the US similar to
what we had in 2006 but would prefer not to dwell on them for now" and proposed
a one year tolling period starting from August 30, 2012.[80]  Cordis considered
signing a one year tolling agreement but wanted to know what the claims were.[81]

Yaron remained "uncomfortable with alleged claims hanging out there
without knowing what they are."[82]  When Paul Coletti, Cordis's in-house counsel,
asked Millson for more information about the potential claims, Millson merely told
Coletti that they were old.[83]  By February 2013, Coletti notified Millson that Cordis
is "not interested in tolling any claims particularly with possible causes of action

---

[79]     DX LR (12/7/12 email from Yaron to Drs. Kobi and Judith Richter)
(emphasis in original).

[80]     DX LL (12/13/12 email from Richter to Yaron).

[81]     *See* Tr. at 314 (Coletti); DX KV (12/18/12 email from Coletti to
Yaron, Millson and Drs. Kobi and Judith Richter).

[82]     DX LA (12/20/12 email from Yaron to Drs. Kobi and Judith Richter).

[83]     *See* Tr. at 311 (Coletti) and 557 (Millson).

which are greater than 6 years old."[84]  Coletti testified that Medinol offered to share

a draft complaint, but only after the tolling agreement was signed.[85]  Cordis did not

agree to this condition and Medinol filed suit on March 4, 2013.

Numerous representatives from Cordis testified that from the time

negotiations began in early 2006 until Medinol filed suit in March 2013, they never

contemplated a lawsuit based on the Pinchasik patents.  Medinol – which had

actively sued Cordis for years –  never raised the Pinchasik patents in prior

litigation (against Cordis or any third party anywhere in the world).  Medinol never

raised the Pinchasik patents as an issue during the negotiations surrounding this

deal.  Coletti examined the existing litigation between Medinol and Cordis, as well

as Medinol's patent estate, in 2006 and 2007.  Although the Pinchasik patents were

included in the list of Medinol's patent estate, nothing in those documents gave

Coletti the impression that Medinol contemplated an infringement claim.[86]

---

[84]     DX LB (2/5/13 email from Donna Hutchinson, Millson's assistant, to Millson, transcribing voicemail from Coletti).

[85]     *See* Tr. at 316 (Coletti).

[86]     *See id*. at 308-309 (Coletti).  When the first Pinchasik patent was filed in 1995, Coletti formed the opinion that it was either invalid or weak.  *See id*. at 297-299.  Coletti did not again consider the Pinchasik patents as a potential problem.  Coletti's opinion about the Pinchasik patents would not, on its own, justify Cordis's belief that Medinol had abandoned its potential Pinchasik claims. However, it can properly be considered a contributing factor to Cordis's lack of notice in light of the other facts and circumstances surrounding this case.

## III.   APPLICABLE LAW[87]

Laches is an equitable defense to a claim for patent infringement. "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar."[88] "To prevail on a defense of laches, a defendant must establish that (1) the plaintiff's delay in filing a suit was 'unreasonable and inexcusable,' and (2) the defendant suffered 'material prejudice attributable to the delay.'"[89]

Under Federal Circuit precedent, the period of delay may not begin prior to the issuance of the patent.[90]  The issuance of a patent establishes only the maximum period of delay. The actual period of delay begins when the patentee "knew or reasonably should have known of the defendant's alleged infringing

---

[87]     This patent infringement action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.  Venue is proper in this District under 28 U.S.C. §§  1391(b), 1391(c) and 1400(b). *See* JPTO at 3.

[88]     *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc).

[89]     *Pei–Herng Hor v. Ching–Wu Chu*, 699 F.3d 1331, 1334 (Fed. Cir. 2012) (quoting *Aukerman*, 960 F.2d at 1028).

[90]     *See Aukerman,* 960 F.2d at 1032.

activities to the date of suit."[91]  "The reasonableness of the behavior of the person

against whom laches is asserted depends on the facts of the particular case."[92]

"[C]ourts impose a duty on patentees to police their patent rights and will impose

constructive knowledge based on the required reasonable, diligent inquiry."[93]  "A

patentee must investigate 'pervasive, open, and notorious activities' that a

reasonable patentee would suspect were infringing.  For example, sales, marketing,

publication, or public use of a product similar to or embodying technology similar

to the patented invention . . . give rise to a duty to investigate whether there is

infringement."[94]  "[C]onstructive knowledge of the infringement may be imputed to

the patentee even where he has no actual knowledge of the sales, marketing,

publication, public use, or other conspicuous activities of potential infringement if

these activities are sufficiently prevalent in the inventor's field of endeavor."[95]

        A delay of more than six years before bringing suit raises a

---

[91]     *Id.*

[92]     *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d
1157, 1162 (Fed. Cir. 1993).

[93]     *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 679 F.
Supp. 2d 512, 520 (D. Del. 2010).

[94]     *Id.* (quoting *Wanless v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed.
Cir. 1998)).

[95]     *Wanless*, 148 F.3d at 1338.

presumption that such a delay was both unreasonable and prejudicial to the

defendant.[96]  "Where the presumption is established, the burden shifts to the

patentee to produce sufficient evidence to 'put the existence of a presumed fact

into genuine dispute' with regard to the reasonableness of the delay or the alleged

prejudice."[97]  If the patentee fails "to come forward with either affirmative

evidence of a lack of prejudice or a legally cognizable excuse for its delay in filing

suit, the two facts of unreasonable delay and prejudice '*must* be inferred.'"[98] But if

the patentee raises sufficient evidence to challenge the presumption, it "completely

vanishes" and the defendant "is left to its proof" or "actual evidence."[99] Whether

the presumption applies or is rebutted, the "defendant bears the ultimate burden of

persuasion [which] does not shift by reason of the patentee's six-year delay."[100]

　　　　"A court must consider and weigh any justification offered by the

---

[96]     *See Adelberg Lab., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1271 (Fed. Cir. 1990).

[97]     *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc*. No. 07 Civ. 127, 2014 WL 533425, at *7 (D. Del. Feb. 7, 2014) (quoting *Aukerman*, 960 F.3d at 1038).

[98]     *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553–54 (Fed. Cir. 1996) (emphasis in original) (quoting *Aukerman*, 960 F.2d at 1037).

[99]     *Aukerman*, 960 F.2d at 1037-38.

[100]    *Id.* at 1038-39.

plaintiff for its delay."[101]  Excuses that have been recognized in certain instances
include: "other litigation; negotiations with the accused defendant; possibly
poverty and illness in limited circumstances; wartime conditions; extent of
infringement; and dispute over ownership of the patent."[102] The Federal Circuit has
"affirmed findings of unreasonableness for delays of less than six years."[103]

Prejudice can take the form of either economic or evidentiary
prejudice.[104]  Economic prejudice arises when "a defendant and possibly others will
suffer the loss of monetary investments or incur damages which likely would have
been prevented by earlier suit."[105]  Prejudice must be established beyond the
"damages or monetary losses . . . attributable to a finding of liability for
infringement" because otherwise "[e]conomic prejudice would . . . arise in every
suit."[106]  Rather, courts "look for a *change* in the economic position of the alleged

---

[101]    *Id.* at 1033.

[102]    *FMC Corp. v. Guthery*, No. 07 Civ. 5409, 2009 WL 1033663, at *4
(D.N.J. Apr. 17. 2009) (citing *Aukerman*, 960 F.2d at 1033).

[103]    *Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed. Cir. 1992)
(collecting cases).

[104]    *See Aukerman*, 960 F.2d at 1033.  In this case, Cordis only alleges
economic prejudice.  *See* Def. Conclusions of Law ¶¶ 29-34.

[105]    *Aukerman*, 960 F.2d at 1033.

[106]    *Id*. (citations omitted).

infringer during the period of delay."[107]

   "The change must be because of and as a result of the delay."[108]
Courts have found that a patentee's delay in bringing a suit can cause prejudice by
"depriv[ing] [the alleged infringer] of the opportunity to modify its business
strategies."[109]  Courts have also found that "[m]aking heavy capital investment and
increasing production can constitute prejudice" when those investments are
causally connected to plaintiff's delay.[110]

---

[107]   *Id*.

[108]   *Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1294 (Fed.
Cir. 1992).  *Accord ABB Robotics, Inc. v. GMFanuc Robotics Corp*., 52 F.3d 1062,
1065 (Fed. Cir. 1995) ("[C]ases in which economic prejudice has been found
lacking did not so hold because of a lack of capital investments, but, rather,
because the alleged infringer failed to prove that their increased expenditures, i.e.,
on marketing and development, were in any way related to actions taken by the
patentee.").

[109]   *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
No. 10 Civ. 122, 2013 WL 3776173, at *7 (W.D. Ky. July 16, 2013).  *Accord
Lautzenhiser Tech. LLC v. Sunrise Med. HHG, Inc*., 752 F. Supp. 988, 1004 (S.D.
Ind. 2010) ("If [plaintiff] had sued earlier, Defendants likely never would have
expended time and money to [develop the allegedly infringing products]. What is
more, common sense suggests that Defendants would have modified their business
strategies if they came under suit for infringement.").

[110]   *Adelberg Lab.*, 921 F.2d at 1272.  *Accord Technology for Energy
Corp. v. Computational Sys., Inc.*, Nos. 92-1542 and 92-1551, 1993 WL 366350, at
*7-8 (Fed. Cir. 1993) (finding economic prejudice where defendant expanded its
business, including employees, sales, and research and development).  *But see
Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371-72 (Fed. Cir. 2001)
(upholding district court finding that "the hiring of new employees, modification of

"The establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case. . . . Those factors merely lay the foundation for the trial court's exercise of discretion."[111]  The court "must weigh all pertinent facts and equities in making a decision on the laches defense."[112]  "Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied."[113]

## IV.   CONCLUSIONS OF LAW

### A.   Length of Period

#### 1.   Effect of Product Release Dates

Medinol claims that "the alleged period of delay for [its] claims with respect to Cypher and Cypher Select cannot begin until 2002 and 2003, respectively."[114] Medinol is wrong as to Cypher, which is nothing more than the

---

equipment, and engagement in sales and marketing activities related to the new [product] are damages normally associated with a finding of infringement and do not constitute the type of damages necessary for a finding of economic prejudice.").

[111]   *Aukerman*, 960 F.3d at 1036.

[112]   *Id*. at 1034.

[113]   *Id*. at 1036.

[114]   Plaintiffs' Conclusions of Law ("Pl. Concl.") ¶ 16.

BX Velocity with a sirolimus coating and "none of the Pinchasik[] patents include[] a drug-eluting coating as a claim limitation."[115]   The BX Velocity is the real product at issue in this suit.  Medinol's claims on the Pinchasik patents were available when Cordis began to sell the BX Velocity as a bare-metal stent in 1999.

### 2.    Effect of Patent Issuance Dates

Cordis argues that the period of delay should begin on November 9, 1999 for all four patents "because unlike the typical laches case which involves different patents on different inventions, the Pinchasik patents are all essentially the same."[116]  It is undisputed that all four Pinchasik patents are continuation applications from the '373 patent and have the same specifications and figures. Section 120 of Title 35 of the United States Code allows a patentee to submit a continuation application that will receive the same priority date as the original patent application but can include new claims.  A continuation application will not extend the term of the patent.  Most importantly,

> the later application [may] contain no more disclosure than the original application upon which it is based. . . [T]he continued-prosecution-application . . . operate[s] on the underlying assumption that the later application is simply extending prosecution of the first. . . [T]he prohibition against the entry of new matter applies [and] the applicant cannot add any disclosure

---

[115]    Stip. Facts ¶ 12.

[116]    Defendants' Conclusions of Law ("Def. Concl.") ¶ 11.

to the later application beyond that necessarily inherent in the disclosure of the parent application as filed.[117]

Although the claims in the four Pinchasik patents at issue are different, there is no new matter in any of the applications, because there *cannot be*.

But Cordis cites no authority in support of its argument that this case should be an exception to the general principle that the period of delay cannot begin until a patent issues.[118] This Court was able to find only one unpublished decision from the Northern District of California in 1994 that could provide support for Cordis's position.  In *Teradyne, Inc. v Hewlett-Packard Co.*, the court held that the general laches rule does not apply to reissue patents, and that the laches period should begin at the issuance of the original patent, to the extent the claims in the reissue patent "are identical to claims that existed" in the original patent.[119]  Reissue applications are generally limited to correcting an error that

---

[117]     Moy's Walker on Patents § 3:61.  *Accord* Manual of Patent Examining Procedure § 201.07 ("The disclosure presented in the continuation must be the same as that of the original application; i.e., the continuation should not include anything which would constitute new matter if inserted in the original application.").

[118]     The rule that it is erroneous to calculate the laches period from the date of the first patent in cases involving multiple patents is established Federal Circuit law.  *See, e.g.*, *Asics*, 974 F.2d at 1307.

[119]     *Teradyne, Inc. v. Hewlett-Packard Co.*, No. 91 Civ. 0344, 1994 WL 327213, at *8  (N.D. Cal.  June 24, 1994).

renders the underlying patent wholly or partially invalid, but when granted, "the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent."[120]  In 2010, a court in the Central District of California declined to apply the *Teradyne* decision to continuation applications, finding that "the unreported *Teradyne* decision regarding reissue claims is inapposite."[121]

Despite the general lack of case law pertaining to this issue, I find Cordis's argument compelling.  The laws and regulations governing continuation patents reveal that each subsequent patent applies to the same invention.  While continuation patents can add new claims, because those claims can only be based on the original disclosures and specifications stated in the first application, they could have been made in that first application.  "The law on laches is rooted in the equitable principle that courts will not assist one who has slept on his rights."[122]  In

---

[120]   35 U.S.C. § 252.

[121]   *In re Katz Interactive Call Processing Patent Litig.*, 712 F. Supp 2d 1080, 1110 n. 7 (C.D. Cal. 2010),  *aff'd in part, vacated in part, remanded*, 639 F.3d 1303 (Fed. Cir. 2011).

[122]   *Crown Packaging*, 679 F. Supp. at 519 (marks omitted).  *Accord Lane & Bodley Co. v. Locke,* 150 U.S. 193, 201 (1893) ("Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them.").

light of this maxim, it makes sense to consider the laches period for continuation patents to start with the issuance of the original patent. Nonetheless, because resolution of this issue does not affect the outcome of the case, I decline to resolve this question.

### 3.  Richter's Actual or Constructive Knowledge

Richter's testimony that he only became aware of a potential Pinchasik claim in 2005 is not credible. Richter did not sue on the Pinchasik patents because he thought he would win on the Israel patents, not because he was unaware of the potential claim. I will later address whether this decision constitutes a reasonable delay, but it certainly shows that Richter had constructive, if not actual, knowledge of the potential infringement at the time the BX Velocity was released in 1999 and the Cypher Select was released in 2003.

### 4.  Calculation of Laches Periods

Even if the period of maximum delay begins with the issuance of each individual patent, the delay for each patent is still significantly longer than the presumptively unreasonable six years. As to claims against Cypher, the period of delay for the '552 patent is 13 years, 3 months and 23 days; for the '811 patent it is 12 years, 9 months and 23 days; for the '276 patent it is 9 years, 7 months and 24

days; and for the '228 patent it is 7 years, 10 months and 27 days.[123]

**B.    The Majority of Medinol's Delay Was Unreasonable and Inexcusable**

**1.    November 1999 - October 2004: The *Israel* Litigation**

Cordis argues that "[a]ny claims based on the Pinchasik patents should have been asserted in 2000, as part of the lawsuit that Medinol actually instituted on the Israel patents" because "the patents were related" and "[t]he validity issues" and "infringement issues" were the same.[124]  Richter's decision not to sue on the Pinchasik patents in 2000 was undoubtedly strategic, but that does not render it unjustifiable or inexcusable.

Had Richter sued on the Pinchasik patents in 2000 at the same time as the Israel patents, he may have been forced to take conflicting positions in the same lawsuit about whether the BX Velocity is or is not uniformly flexible.  It was not unreasonable to proceed on a suite of patents that Medinol believed was stronger and that was licensed to Boston Scientific, a major player in the medical devices field, instead of other patents that have never been sold, licensed or

---

[123]    The periods are calculated from the issuance of the patent until, but not including, March 4, 2013, the date the complaint was filed.  Because the Cypher Select was not sold until 2003, the applicable period for those claims is shorter by approximately four years for the '552 patent and three years for the '276 patent.

[124]    Def. Concl. ¶ 16.

enforced.

But for reasons explained below, Medinol's period of excusable delay ended on October 4, 2004 when the Supreme Court denied its petition for a writ of certiorari.  With the exception of a brief tolling period, the remainder of the nearly 8 and a half year delay is unreasonable and inexcusable.

### 2.  October 2004 - August 2012: Negotiation and Business Relationship

#### a.  October 2004 - March 2006

Richter's testimony that he was not aware of a potential claim on the Pinchasik patents is not credible. Medinol provides no other justification for the delay between October 4, 2004 and March 15, 2006, when Medinol and Cordis began negotiations. Medinol argues that the remainder of its delay, at least until the August 2012 termination agreement, is reasonable because Medinol and Cordis were "negotiating, carrying out, and terminating a major business venture pursuant to the distribution agreement."[125]

#### b.  March 2006 - June 2006

Several early laches opinions hold that business negotiations between

---

[125]   Pl. Concl. ¶ 9.

the plaintiff and the alleged infringer can justify a delay.[126]  In a recent case from

the Northern District of Illinois, the court held that a delay was reasonable when

"the length of delay corresponds to the negotiations between the parties to develop

a business relationship and resolve their patent and licensing issues" and the

plaintiff files suit "a short time" after negotiations end without a final agreement.[127]

A key distinguishing fact in these cases is that the parties carried out negotiations

over the patents or licenses *at issue in the suit*.  In this case, the parties carried out

negotiations to 1) *settle existing* patent litigation and 2) create a business

partnership to distribute Medinol's stents.  The Pinchasik patents were not at issue

in the negotiations, nor were they ever raised as a potential issue before or after the

deal was finalized.

Notice to the alleged infringer of a potential claim is a key to the

laches analysis in an infringement case.  In *Vaupel Textilmaschinen KG v.*

*Meccanica Euro Italia S.P.A.*, the court evaluated whether a plaintiff may claim

that he delayed bringing suit against one party while litigation was pending against

a third party.  The Federal Circuit held that "[f]or other litigation to excuse a delay

---

[126]     *See Aukerman Co. v. Miller Formless Co., Inc.*, 693 F.2d 697, 700
(7th Cir. 1982).  *See also Continental Coatings Corp. v. Metco, Inc*., 464 F.2d
1375, 1377–78 (7th Cir. 1972).

[127]     *DSM Desotech, Inc. v. 3D Sys. Corp.,* 900 F. Supp. 2d 783, 793 (N.D.
Ill. 2012).

in bringing suit, there must be adequate notice of the proceedings to the accused infringer. . . . Notice is important [because it] informs the accused infringer of the existence of the suit and that a subsequent suit will be filed against him.  He can then change his activities to avoid liability."[128]

While "there has been no clearly established rule set forth by the Federal Circuit (or any other court) which absolutely requires a patentee to make an infringement allegation prior to bringing suit . . . the proper test requires an objective inquiry into whether the patentee acted reasonably in light of all of the circumstances."[129] "Despite all of the evidence of potential infringement it possessed, [Medinol] never made such a direct inquiry of infringement to [Cordis] prior to filing suit. While such facts are not dispositive, they must still be considered by the Court among the totality of the circumstances to determine if [Medinol] acted as a reasonable patentee."[130]

Medinol argues that Cordis knew, or must have known, about the

---

[128]  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 877 (Fed. Cir. 1991).

[129]  *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, No. 09 Civ. 290, 2014 WL 183212, at *26 (W.D. Pa. Jan. 14, 2014) (citing *Hemstreet,* 972 F.2d at 1293 ("*Aukerman* restores equitable flexibility: The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant.")).

[130]  *Id.*

Pinchasik claims throughout the time period leading up to the 2006 agreement. This argument is unavailing because various Cordis representatives testified credibly that they did not know and had no reason to know that Medinol was considering a suit on the Pinchasik patents.  Richter admits that he did not disclose the potential suit because he did not want to jeopardize the deal.  But "to the extent [Medinol] would justify its delay because an earlier assertion might have jeopardized business dealings with [Cordis], the excuse is insufficient."[131]

### c.    June 2006 - July 2008: Effect of Tolling Agreements

The 2006 and 2007 agreements include a provision tolling the statute of limitations period for "any U.S. claims" that either party may have against one another from June 19, 2006 until and including July 7, 2008.[132]  There is no express statute of limitations period in patent law applicable to an individual's patent infringement claim. The only limitation period involving patent infringement suits merely restricts the period of recovery of damages to six years.[133] Cordis argues that these agreements merely "toll the statute of limitations for two years,

---

[131]    *MVC v. King Seeley Thermos Co.*, 870 F.2d 1568, 1572 (Fed Cir. 1989).  *Accord Lane & Bodley Co.*, 150 U.S. at 201 (plaintiff's delay is inexcusable when he "preferred for prudential reasons, to receive a salary from the defendant rather than to demand a royalty").

[132]    DX S § 2 and DX R § 2.8.

[133]    *See* 35 U.S.C. § 286.

[allowing] Medinol [to] seek damages for eight years, not six" but "do not extend the laches period."[134]

In support of this proposition, Cordis cites *Cornetta v. United States*, which held that "[l]aches must be applied 'apart [from] and irrespective of' the statute of limitations."[135]   Thus, the court held that while the plaintiff's "post-discharge service in the Coast Guard stopped the running of the six-year statute of limitations . . . it did not affect the period to be considered in determining whether laches affects his claim" for reinstatement and back pay stemming from his allegedly unlawful discharge.[136]   Cordis also cites the *Aukerman* decision which explained that the statute of limitations defense in patent actions is "an arbitrary limitation on the period for which damages may be awarded. . . . Laches, on the other hand, invokes the discretionary power of the district court to limit the defendant's liability for infringement by reason of the equities between the particular parties."[137]

Laches analysis is separate and distinct from the statute of limitations

---

[134]   Def. Concl. ¶ 25.

[135]   851 F. 2d 1372, 1378 (Fed. Cir. 1988) (quoting *Pepper v. United States*, 794 F.2d 1571, 1573 (Fed. Cir. 1986)).

[136]   *Id*.

[137]   *Aukerman*, 960 F.3d at 1030.

analysis.[138]  But it is within my discretion to credit Medinol with the 2 year and 19

day period covered by the 2006 and 2007 agreements for reasons of equity.  This

short period of reasonable delay does not cure the earlier unreasonable delays.

### d.    July 2008 - August 2012

Medinol argues that "by agreeing to preserve and toll Medinol's U.S.

[] claims . . . Cordis induced Medinol to forego a lawsuit" thereafter and is not

entitled to a laches defense.[139]  This argument is meritless.  Medinol made a

decision to pursue a business relationship and, without providing notice of the

potential claims to Cordis, secured a two year period to contemplate whether that

business relationship was more important than a potential lawsuit.  Having had two

years to think about a potential lawsuit, Richter decided that he could either "bring

the lawsuit and most probably terminate the relation[ship]" or he could continue to

"nurture the cooperation."[140]  Medinol made both of those decisions on its own.

Further, Medinol's argument that it did not bring a lawsuit between February 2011

and August 2012 because Richter first wanted to extricate Medinol from the

---

[138]    I take note of Medinol's argument that the tolling provision in
*Cornetta* was statutory, not contractual.  *See* Pl. Concl. ¶ 10 n. 35.  While
important, the source of tolling does not change the basic conclusion that statute of
limitations and laches are two different legal principles.

[139]    *Id*. ¶ 14.

[140]    Tr. at 401 (Richter).

exclusivity arrangement with Cordis would be more convincing if Richter had not

threatened Cordis with litigation over the alleged breach of contract in August

2011.

### 3.     August 2012 - March 2013: Renewed Negotiation

Medinol's asserted reason for the delay during this time period is that

it was trying to negotiate a renewed business partnership with Cordis.  However,

the issue of notice is even more glaring during this period than during the 2006

negotiations.  By this point, even the most recent Pinchasik patent was close to

eight years old.  If Cordis had no reason to have constructive notice of the

Pinchasik claims in June 2006, it certainly had no reason to have constructive

notice of those claims in December 2012.

The unreasonable and inexcusable nature of Medinol's delay is all the

more evident after acknowledging how long the period of delay is even after 1)

calculating the laches period from the issuance of each individual continuation

patent; 2) excusing the delay during the *Israel* litigation; and 3) giving Medinol

credit for the 2 year and 19 day tolling period.  The shortest delay is still 5 years,

10 months and 5 days – just short of the presumptively unreasonable six years.  It

is within my discretion to find that a delay of less than six years is unreasonable.[141]

---

[141]     *See Asics,* 974 F.2d at 1307.

For the reasons stated above, I conclude that Cordis has shown with actual proof that the delay between October 4, 2004 and March 1, 2013, excluding the tolling period, was unreasonable and inexcusable.

### C.   Cordis Suffered Economic Prejudice

Cordis insists that "the simplest demonstration of economic prejudice is to focus on Cordis's likely reaction in the event that Medinol won at a trial brought in a timely manner and that Cordis was enjoined or a judgment in Medinol's favor was affirmed on appeal."[142]   Medinol argues that there is no legal support for this "novel prejudice" theory, and that the proper prejudice analysis is to see whether Cordis would "have acted differently if Medinol had sued earlier."[143]   Neither party has correctly stated the standard for proving prejudice.

To show economic prejudice, Cordis must demonstrate a material change in its economic position during the period of delay that occurs "because of and as a result of the delay."[144]   What Cordis would or would not have done and at what time is not as important as the actions Cordis *did* take and the reasons it took those steps.   Cordis would not have entered into a business relationship with

---

[142]   Def. Concl. ¶ 40.

[143]   Pl. Concl. ¶ 23.

[144]   *Hemstreet*, 972 F.2d at 1294.

39

Medinol if Medinol had sued on the Pinchasik patents earlier or if Cordis knew that Medinol was clinging to a Pinchasik lawsuit in the event that the business relationship deteriorated.

Entering into the 2007 settlement and distribution agreements changed Cordis's economic position dramatically.  *First*, Medinol negotiated an indemnification clause in the settlement agreement in connection with an ongoing dispute with Boston Scientific.[145]  As a result of that indemnification, Cordis paid approximately $100 million to Boston Scientific.[146]  *Second*, because Cordis was never sued on the Pinchasik patents, it never had the opportunity to develop a non-infringing stent, as it did by developing the BX Agile stent after the BX Velocity was accused of infringing the Israel patents.

Most importantly, Cordis entered into the business relationship in order to bolster its own flagging stent business, which had begun to decline as early as 2006.[147]  At or around this time, Cordis began to look for other partnerships to help revive its stent business, including investigating Medinol's

---

[145]    *See* DX S § 2.5

[146]    *See* Tr. at 304-305 (Coletti).

[147]    *See* Tr. at 415 (Anderson) ("In 2007 – it actually started in 2006 . . . we saw almost a 50 percent drop of the penetration of drug-eluting stents in the market" and "other major global players [were] entering the marketplace.").

40

"family of stents."[148]  All of this reveals that had Cordis not entered into a business agreement with Medinol, it could have exited the stent market earlier or redirected its investments to other products.

In *ABB Robotics, Inc. v. GMFanuc Robotics Corp*., the Federal Circuit found economic prejudice where the delayed suit resulted in the alleged infringer continuing to invest in its business with expenditures on procuring patents and developing related technology, a threefold expansion of the alleged infringing activity, and failure to take a license under the relevant patent.[149]  "Even a considerable investment during a delay period is not a result of the delay if it was 'a deliberate business decision to ignore [a] warning, and to proceed as if nothing had occurred.'"[150] But here, Cordis did not ignore any warnings.

Medinol first sat on the Pinchasik claims for nearly seven years, suing Cordis on other patents around the world but never asserting these claims.  Then, Medinol engaged in business negotiations and signed a settlement agreement with Cordis, settling all outstanding litigation but never disclosing its potential Pinchasik claims.  Finally, Medinol continued to hold off on bringing its suit as the

---

[148]     *Id*. at 428 (Anderson).

[149]     *See* 52 F.3d 1062, 1065 (Fed. Cir.1995).

[150]     *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995) (quoting *Hemstreet,* 972 F.2d at 1294).

business relationship deteriorated and Cordis's stent business plummeted.

At numerous points over the last fourteen years, "[Medinol's] delay in bringing an infringement action deprived [Cordis] of the opportunity to modify its business strategies."[151]  Now, because Medinol has waited to sue until after Cordis has exited the stent industry altogether, Cordis lacks the ability to offset its losses with profits on existing sales. Cordis has shown sufficient proof of economic prejudice to warrant the application of laches.[152]

## V.    CONCLUSION

For the foregoing reasons, I find that laches presents an entire defense to Medinol's infringement claims.  Plaintiff's action is DISMISSED with prejudice and the Clerk of the Court is directed to close this case.

---

[151]    *SCA Hygiene*, 2013 WL 3776173, at *7.

[152]    The bulk of Cordis's economic prejudice argument pertained to steps it could or would have taken had Medinol sued earlier and won, including, for example, using a different platform for its drug-eluting stent or moving its manufacturing facilities abroad.  Because Cordis has provided sufficient other proof of other economic prejudice, I need not address these points.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 14, 2014

**-Appearances-**

**For Plaintiff:**

Richard Louis DeLucia, Esq.
Elizabeth A. Gardner, Esq.
Aloysius Antony Pfeffer, Esq.
Caryn Harsche Cross, Esq.
Mark Alexander Chapman, Esq.
Eric Thomas Schreiber, Esq.
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

Arthur R. Miller, Esq.
New York University School of Law
40 Washington Square South, 430F
New York, NY 10012
(212) 992-8147

**For Defendants:**

Gregory L. Diskant, Esq.
Scott Barry Howard, Esq.
Kathleen Marie Crotty, Esq.
Anthony Christopher DeCinque, Esq.
Marla Phyllis Dunn, Esq.
Peter Abraham Nelson, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2710